OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Freida Rickey, filed October 21, 2005. Rickey is the sister of George W. Baker, the ward herein, and she filed an application for guardianship of Baker on September 19, 2005. Rickey also held Baker's power of attorney. Prior to Rickey's application, Attorney Brandin Marlow filed an application for guardianship of Baker, on August 24, 2005. Baker, in his seventies, suffers from dementia, Alzheimers, traumatic brain injury and anxiety disorder.
 {¶ 2} A hearing was held on the applications on September 19, 2005. At the time of the hearing, Baker resided at Good Shepherd Village, a nursing home in Springfield, Ohio. Baker had resided there since September, 2004. At the hearing, the parties stipulated to Baker's incompetency. The probate court considered the report of its court-appointed investigator, a Statement of Expert Evaluation submitted by Jerald S. Dudney, M.D., and the testimonies of (1) Vickie Dutton, a long-term care ombudsman employed in Dayton, Ohio, and involved in Baker's care; (2) Tina Morris, director of nursing at Good Shepherd Village; (3) Frieda Rickey, and (4) Shirley Collins, Baker's other sister.
 {¶ 3} On September 19, 2005, the court denied Rickey's application and ordered that Marlow be appointed Baker's guardian. The court determined that Baker had resided in several facilities since 1997, and that his sisters "have caused Mr. Baker to be removed to different nursing homes on at least five different occasions." The court noted that its investigator estimated that Baker "actually has lived in as many as fifteen separate nursing facilities since 1997. In each case, the sisters have disagreed with the nursing staff's administration of anti-psychotic drugs. Apparently, Mr. Baker is subject to exhibit instances of combativeness and aggressiveness while living in these nursing facilities. It has been the position of each nursing facility that he is in need of anti-psychotic medication for his safety and the safety of the staff and to afford an opportunity for some quality of life during his stay in the nursing facilities." The court noted Rickey's and Collins' "adamant" position against the administration of any anti-psychotic medication to Baker and their "intentions to seek the removal of George Baker once again, despite the testimony that he is progressing very well in his current surroundings." The court found the sisters' insistence on the issue of medication "rather pronounced and historic." The court concluded that it was "in the best interest of George Baker to appoint a third party as his guardian at this time."
 {¶ 4} Rickey's sole assignment of error is as follows:
 {¶ 5} "WHETHER THE LOWER COURT ABUSED ITS DISCRETION IN REACHING ITS DECISION TO APPOINT A THIRD PARTY AS GUARDIAN INSTEAD OF NEXT OF KIN OR THE SISTER WHICH HELD A DURABLE POWER OF ATTORNEY FOR THE SUBJECT WARD."
 {¶ 6} "In evaluating applications for the appointment of a guardian, the probate court must engage in a two-part determination: (1) it must first determine that a guardian is required; and (2) it must also determine who shall be appointed guardian." In re Guardianship of Friend (Dec. 16, 1993), Cuyahoga App. No. 64018. "In matters relating to guardianships, the probate court must act in the best interests of the incompetent. In re Estate v. Bednarczuk (1992),80 Ohio App. 3d 548, 551, 609 N.E.2d 1310. A probate court's decision regarding the appointment of guardians will not be reversed absent an abuse of discretion. Id." Matter of Guardianship of Bolin (April 18, 1997), Miami App. No. 96-CA-30. An abuse of discretion implies more than an error of law or judgment, but rather suggests that the trial court acted in an unreasonable, arbitrary or unconscionable manner. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140. "The probate court, as a trier of fact, has the discretion to determine what weight will be afforded to the evidence, and a presumption exists that the findings of the trier of fact are correct." Matter ofGuardianship of Worth (June 20, 1997), Darke App. No. 1430 (internal citations omitted).
 {¶ 7} Prior to appointing a guardian, a probate court must appoint a regular probate court investigator "to investigate the circumstances of the alleged incompetent, * * * and subsequently to file with the court a report that contains * * * (3) A recommendation regarding the necessity for a guardianship or less restrictive alternative. * * * (B) The report that is required * * * shall be made a part of the record in the case and shall be considered by the court prior to establishing any guardianship for the alleged incompetent." R.C. 2111.041.
 {¶ 8} Rickey and Marlow were the only applicants for the guardianship of Baker. The arguments in Rickey's brief may be summarized as follows: (1) "a guardianship was not the less restrictive alternate"; (2) Baker is kept "under complete control" with anti-psychotic medication and Dutton, as Baker's advocate, "testified that she was against chemical restraints"; (3) the investigator's report upon which the court relied is inaccurate and (4) the court wrongly considered "a possibility" that Rickey and Collins caused an injury to Baker.
 I {¶ 9} In her brief, Rickey cites R.C. 2111.02(C)(5), which provides in relevant part that, "[p]rior to the appointment of a guardian * * * the court shall conduct a hearing on the matter of the appointment. The hearing shall be conducted in accordance with all of the following: * * * (5) Evidence of a less restrictive alternative to guardianship may be introduced, and when introduced, shall be considered by the court."
 {¶ 10} Rickey appears to argue that her "durable power of attorney and medical power of attorney" for Baker constitute evidence of a less restrictive alternative to guardianship, pursuant to which the court should have denied Marlow's application. On cross-examination, Rickey was asked if she had "a power of attorney" for Baker, she answered affirmatively, and she handed the document to counsel. The document was not introduced into evidence, and there was no testimony about its contents. Rickey has accordingly waived her argument herein regarding her powers of attorney. Rickey's argument is further waived by the following exchange which occurred during Rickey's cross-examination by counsel for Marlow:
 {¶ 11} "Q. So you agree that a guardian, [Baker] needs to have a guardian to take care of him, right?
 {¶ 12} "A. Yes. Yes."
 {¶ 13} The report of the court's investigator concurred that there was a necessity for guardianship because "Mr. Baker is not able to speak and express his wishes nor to think well enough to make informed decisions for himself." Finally, the Statement of Expert Evaluation, submitted by Dr. Jerald Dudney on August 25, 2005, recommended that Marlow's application for guardianship be granted. The probate court did not abuse its discretion in determining that Rickey's powers of attorney did not constitute a less restrictive alternative to guardianship.
 II {¶ 14} As a long-term care ombudsman, Dutton's job is "to advocate for residents in nursing homes * * *." Contrary to Rickey's assertion, she did not testify that she was against chemical restraints, but rather stated "an ombudsman does not advocate for chemical restraints." Dutton testified that Wright Rehab, a nursing facility in Greene County where Baker resided prior to residing at Good Shepherd Village, issued a 30 day discharge to Baker because "the family was not helping them or not allowing them to follow the plan of care set forth by the physician. * * * Mr. Baker was determined that he lacked some capacities so he's not able to always fully understand requests as far as care and things like that, so he was combative to staff and I think other residents too. So nursing homes have an obligation to provide some quality of life, of course to that resident, and they determined the quality of life could be met maybe through some medications. And I understand that the family was against that. * * * [Wright Rehab was] not able to meet his needs because of that." Rickey testified that she opposes anti-psychotic medications because when Baker is on them, "he always gets pneumonia. He stays on antibiotics from time to time. I mean, It's a constant thing."
 {¶ 15} Dutton testified that she has advocated against the use of medications when she felt that their use was not appropriate, and that she "would be concerned about someone who is not — who could possibly be overmedicated and not be able to have a quality of life." She stated that Baker, while medicated, is "alert, he's awake, he still lacks capacity but he's still able to engage in his environment."
 {¶ 16} We further note that Morris testified that, when Baker was first admitted to Good Shepherd Village [after a stay at Greene Memorial Hospital due to pneumonia], "he didn't have [any medication] from Greene Memorial when he came into us. Took five staff members to do care on him every two hours. Until we got him on medication. So we started him on medication, and he started calming down, letting us do care with him. In doing that, it went down to one person taking care of him, a one-on-one, and we do very well with that."
 {¶ 17} Finally, the court appointed investigator noted in his report that Baker "is under the care of Dr. Dudney, who has helped him, through medication, to be more calm and not to swing at people, lash out, curse or grab their private parts — all of which are part of his actions when not medicated."
 {¶ 18} The trial court did not abuse its discretion in determining that Baker "is progressing very well in his current surroundings" on medication. We note that the probate court directed Marlow to "secure the opinion of a second psychiatrist as to the continued need and dosage for anti-psychotic medication" for Baker.
 III {¶ 19} The court's investigator noted in his report that "Mr. Baker has been in at least 15 nursing homes in the greater Dayton area. No one in that area will take him anymore."
 {¶ 20} Rickey argues in her brief that the record of the hearing does not support the investigator's estimate. We note that Rickey did not call the probate court investigator to the stand for questioning regarding his report, but testified that Baker had been in only five or six nursing homes. Morris testified that Baker "has been in about 10 nursing homes." Rickey also testified that Baker is combative, acts out and causes physical problems for the nursing home staff, and that it was her decision to move him from each home that administered anti-psychotic medication as a result of his behavior. The probate court's Entry affirms Rickey's testimony and also makes mention of the investigator's estimate, and it makes no finding regarding the exact number of times Baker has been moved. We note, the probate court correctly determined that Rickey's repeated insistence on relocating Baker, however often, was not in Baker's best interest.
 IV {¶ 21} Dutton testified that she responded, in 2003, to a complaint about an injury to Baker's scrotum at Wright Rehab. The "nursing home was cited at that time, because Ohio Department of Health could not determine actually where the injury had come from," according to Dutton.
 {¶ 22} After Baker was admitted to Good Shepherd Village, Dutton received another complaint in June of 2005 of another injury to Baker's scrotum. The Ohio Department of Health did not cite Good Shepherd Village, or otherwise make a determination of fault. Morris testified that Rickey and Collins visited Baker the day he was injured, and in the course of their visit, they removed him from the common area to his room, and then returned him to the common area. Morris testified that the Ohio Department of Health recommended to her, after the second injury to Baker's scrotum, that when Baker's sisters visit him that "he stays in the common area, that he is not removed."
 {¶ 23} The court appointed investigator stated in his report that "Per the nurse, over the years when Mr. Baker has been removed by his family for visits, he has received 3 broken bones, cuts on his chest and 2 skin tares [sic] to his scrotum. He definitely needs to be where he is currently receiving much needed care and being protected against further moves or home visits. * * *"
 {¶ 24} Rickey testified that Morris investigated the second injury "and then she got back with us and told us that it was done by a ring, that the girl was washing him and, and that the ring cut him." Collins also testified that "we were told that it was the aid that was washing him and it was her ring."
 {¶ 25} Rickey states in her brief that "The Good Shepherd Nursing Home urged [Marlow's] application for guardianship suggesting that the ward's sisters may have caused the second injury to his scrotum * * * This was just a possibility and should not have been considered by the court. According to the credible testimony of the sisters, Tina Morris informed them that the aide's ring had cut Mr. Baker while the aide was cleaning him."
 {¶ 26} Whether or not Morris' testimony and the information "per the [Good Shepherd Village] nurse" suggest a causal connection between the sisters and Baker's injury, it was within the probate court's discretion, while acting in Baker's best interest, to determine what weight to give the evidence before it. We note the probate court's Entry did not find the sisters to be responsible for any injury to Baker.
 {¶ 27} Having thoroughly considered Rickey's sole assignment of error, we find no abuse of discretion in the probate court's determination that Baker was subject to a guardianship and that Marlow would best serve his interests as guardian. As the investigator's report revealed, Baker's circumstances necessitated a guardianship; he is unable to speak and make informed decisions. At the hearing, Rickey herself admitted that Baker needed a guardian. Rickey's insistence that Baker be moved from each home that administers anti-psychotic medications (however many homes there were), medications that made Baker less combative, more receptive to necessary care, and afforded him a quality of life, defies common sense and is not in Baker's best interest. Rickey has failed to overcome the presumption that the probate court's findings of fact are correct. There being no abuse of discretion, Rickey's assignment of error is overruled, and the judgment of the probate court is affirmed.
Grady, P.J. and Wolff, J., concur.